IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case Number: 07-20772-CR-MORENO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.

DULCE CASTELLANOS,
           Defendant.
......................................................./

DEFENDANT'S OBJECTIONS TO
REPORT AND RECOMMENDATION
OF MAGISTRATE JUDGE [Dkt # 57]

      The defendant, DULCE CASTELLANOS, through undersigned counsel files this Defendant's Objections To Report And Recommendation Of Magistrate Judge [Dkt # 57] and in support thereof states:

      Following an evidentiary hearing on all motions to suppress, which were filed on behalf of defendant Dulce Castellanos, the magistrate judge filed a report and recommendation [Dkt # 57] on January 9, 2008 in which that magistrate recommended denial of all of the motions to suppress. That report is legally erroneous and must be corrected upon this review.

# STANDARDS OF REVIEW

After conducting a careful and complete review of the findings and recommendations, a district court judge may accept, reject or modify the magistrate's report and recommendations. 28 U.S.C. § 6326(b)(1); <u>Williams v. Wainwright</u>, 681 F.2d 732 (11th Cir. 1982). A district court judge "shall make a de novo determination of those portions of the report or specific proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). This requires that the district court judge "give fresh consideration to those issues to which specific objection has been made by a party." <u>Jeffrey S v. State Bd. of Educ. Of Georgia</u>, 896 F.2d 507 at 512 (11th Cir. 1990). The district court judge reviews legal conclusions de novo, even in the absence of an objection. *See* <u>Cooper-Houston v. Southern Ry. Co.</u>, 37 F.3d 603 at 604 (11th Cir. 1994).

## REASONS FOR OVERTURNING THE
## REPORT AND RECOMMENDATION

All motions to suppress were predicated on the lawfulness of the search of the Ford Expedition, which defendant Dulce Castellanos was driving. The magistrate judge found that the search of two bags contained in the cargo area of that Expedition

was justified as search conducted as a protective sweep of that vehicle following an investigative stop. Alternatively, the magistrate found that the federal agents were able to search those two bags, because those law enforcement agents had probable cause to believe that those bags contained either contraband or evidence of a crime. Both conclusions were wrong as a matter of law.

The defendant filed two motions to suppress. The first motion to suppress was predicated on the lawfulness of the search of the Ford Expedition. The second motion to suppress challenged a search predicated on a subsequently obtained search warrant on the basis that the fruits of this first vehicle search tainted the search warrant.

The report and recommendation is lengthy. In order to avoid redundancy, these objections will be narrowly directed both in terms of factual recitation and legal argument to establish the legal error that is decisive in determining whether the fruits of the search of two bags placed in the Expedition should be suppressed. The only factual predicate for this magistrate's report is contained in the transcripts of proceedings before the magistrate judge held on December 19, 2007 and January 2, 2008.

The validity of the challenged search can be succinctly placed in a factual context. Federal agents had been conducting an investigation into drug trafficking and money laundering of the proceeds of that illegal venture. Prior to March 15, 2007, that investigation revealed that this trafficking was conducted by William Martinez and Martin Castellanos. William Martinez was the son-in-law of defendant Dulce Castellanos. William Martinez lived with Dulce's daughter at a residence different from the residence of Dulce Castellanos. Martin Castellanos was the husband of defendant Dulce Castellanos. Martin Castellanos lived with defendant Dulce Castellanos at at 5046 N.W. 186th Street, Miami Gardens, Miami-Dade County, Florida.

On March 15, 2007, the federal agents had already obtained a search warrant to search a house in Broward County that the agents believed to be a stash house for this drug operation. While preparing to execute the search warrant in Broward County on that date, federal agents also went to the house of Martin Castellanos to surveil Martin Castellanos. Law enforcement officers saw Martin Castellanos drive away in a white automobile. Those agents followed Martin to a warehouse in Hialeah, Florida where Martin was observed entering and driving away in a truck. The police stopped Martin at approximately 1:30 p.m. Following a search of that

truck, the police seized about eighty-one thousand dollars ($ 81,000.00) in currency from Martin.

### 1. THE PROTECTIVE SEARCH OF THE FORD EXPEDITION WAS ILLEGAL UNDER THE STANDARDS SET IN <u>MICHIGAN V. LONG,</u> 463 U.S. 1032 (1983).

#### A. Facts Relevant To The Protective Sweep Issue.[1]

On March 15, 2007, when Martin Castellanos left his home [which is also the residence of his wife, Dulce Castellanos] in a car, the federal agents surveilling Martin left Martin's home. The police did not leave anyone at that residence to keep watch over that house. (Transcript of Dec. 19, 2007 at 115). After Martin Castellanos was stopped at the Hialeah, Florida warehouse, the federal agents heard Martin's cell phone repeatedly ring. At that moment, the police did not know who was calling Martin's cell phone. (Transcript of Dec. 19, 2007 at 115-116, 153). In response to the seizure of Martin, police directed law enforcement officers to return to Martin's residence [which is also the residence of his wife, Dulce Castellanos] and

---

[1] With few additions, the factual statements are derived from those contained in the Report And Recommendation filed by the magistrate judge. Any additional testimony mentioned in these objections is cited to a page of the transcript. Obviously, there can be no citation to testimony regarding facts not proved and about which no testimony was elicited.

again take up surveillance.

At about 4:30 p.m., Dulce Castellanos drove up to her residence in a Ford Expedition. Dulce went into her house and came out no more than fifteen minutes later with two opaque bags. The bags appeared to have something weighty inside. One of those bags was a laundry-type bag that contained something. The second bag was a gym-type bag that contained something. Dulce placed those two bags in the cargo area of this Expedition. Ducle Castellanos entered the Ford Expedition and drove away with her two grandchildren[2] in the second row of seats. (Transcript of Dec. 19, 2007 at 118).

One of the two bags that Dulce was carrying on March 15, 2007, appeared similar – but was not identical – to a bag that the police seized on January 23, 2007 and which latter bag was used by William Martinez to transport narcotics on January 23, 2007. (Transcript of Jan. 2, 2008 at page 18-19). It was stipulated that neither bag, which Dulce brought to the Expedition, was similar to the bag containing currency that the police seized from Martin Castellanos hours before on March 15,

---

[2]        One of those two children was about four years old. The second child was less than one year old. (Tr of Dec. 19, 2007 at page 57).

2007.  (Transcript of Jan. 2, 2008 at page 19-21).

Moreover, in the opinion of one of the surveilling agents, on March 15, 2007, Dulce Castellanos appeared to act nervously when entering her home and appeared to stare at the surveilling law enforcement vehicle prior to entering her home. Coincidentally, a marked police car was also engaged in some police work in front of Dulce's home when Dulce drove up in the Ford Expedition.  (Transcript of Dec. 19, 2007 at pages 175-176).  Nevertheless, Dulce brought out the two bags described above, placing them in the storage area of the Expedition and still drove away from her home.

Prior to March 15, 2007, the following information was known by law enforcement, which pertained to the residence of Dulce and Martin Castellanos and, in particular, about Dulce Castellanos.

On January 12, 2007, William Martinez appeared at the house of his father-in-law, Martin Castellanos [which is also the residence of his wife, Dulce Castellanos] on the day that Martin was observed picking up drug money at another location.

On January 23, 2007 at another location, William Martinez arrived at the house of his father-in-law Martin Castellanos [which is also the residence of his wife, Dulce Castellanos], and thereafter ultimately arrived at a location where he left four kilograms of cocaine. Martin Castellanos was driving the same red Expedition that Dulce was driving on March 15, 2007. That Expedition was owned by a woman who was both the wife of William Martinez, the daughter of Dulce Castellanos, and the mother of the two children who were inside that Expedition when it was stopped on March 15, 2007.

On February 2, 2007, federal agents saw Dulce driving the red Ford Expedition with her husband, Martin Castellanos, following in a separate car. In the opinion of a surveilling police officer, that officer was concerned that he had been spotted and decided to discontinue surveillance. When that officer drove his surveillance vehicle away, he believed that both Dulce in her Expedition and Martin Castellanos in his separate car followed the surveillance car for several blocks in the neighborhood as these narcotics agents were leaving this area.

Federal agents believed that Martin Castellanos was used by his son-in-law, William Martinez, to deliver drugs and money for William Martinez. On February

15, 2007, Martin Castellanos delivered a large amount of currency to a location in Miami, driving to that location in the same truck that Martin was driving when stopped at the Hialeah warehouse on March 15, 2007.

On March 7, 2007, law enforcement officers observed Dulce Castellanos, Martin Castellanos and their daughter-in-law talking at Martin Castellanos's residence [which is also the residence of his wife, Dulce Castellanos].

On March 15, 2007, based on the above information, the police decided to make an investigative stop of the Ford Expedition. Although the police did not know what was inside the two bags that Dulce brought to the Expedition, the police believed that there might be contraband in those two bags. Immediately upon stopping the Ford Expedition, the police ordered Dulce out of that vehicle, placed Dulce on the ground and handcuffed Dulce.

According to one of the federal agents, the federal agents conducted a "protective sweep' of the Ford Expedition "for narcotics, cash or weapons." (Transcript of Dec. 19, 2007 at page 58, 70). The two bags, which Dulce had put in the cargo area of the Expedition were opened and found to contain a large amount of

currency – later determined to total almost $175,000.00.

**B.	Legal Analysis**.

The defendant concedes that the police had articulable suspicion to stop the Ford Expedition.  (Transcript of Jan. 2, 2008 at page 23). The issue is whether the federal agents could lawfully conduct a protective sweep of that Ford Expedition.

The lawfulness of a protective sweep of a stopped vehicle is controlled by Michigan v. Long, 463 U.S. 1062 (1983).  Long held that during a temporary investigative detention the police may conduct a limited pat down of both the person and the passenger compartment of the vehicle that person is driving under the following circumscribed circumstances, even though the police lack probable cause to arrest or to search the car.  The elements permitting such a protective sweep of a car are the following: "[T]he search of the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, is permissible if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing the suspect is dangerous and the suspect may gain immediate control of weapons."  Long, 463 U.S. 1032 at 1049.  The police can

-10-

conduct an area search of the passenger compartment to uncover weapons, "as long as they possess an articulable and **objectively reasonable belief** that the suspect is potentially dangerous." Long, 463 U.S. 1032 at 1051.

The Government did not meet its burden of proof that there were articulable facts to establish that **Dulce** Castellanos was presently dangerous, let alone armed, at the time that this protective sweep of the Expedition was conducted.

There is no testimony that any police officer saw a bulge in Dulce's clothing on March 15, 2007. Likewise, there is no testimony that any police officer say a bulge inside either of the two bags that Dulce carried to the rear of the Ford Expedition. As the prosecutor candidly conceded during legal argument before the magistrate judge, the federal agents had no knowledge of what was inside those two opaque bags at the time that this Ford Expedition was stopped. (Transcript of Jan. 2, 2008 at page 30).

In terms of Dulce Castellanos, **herself**, there is no evidence that Dulce ever dealt or touched illegal drugs. In terms of Dulce Castellanos, **herself**, there is no evidence that Dulce Castellanos ever engaged in money laundering.

There was no evidence that Dulce had any criminal record. (Transcript of Dec. 19, 2007 at page 121). There was no evidence that Dulce had ever been arrested for anything, let alone a crime of violence. (Transcript of Dec. 19, 2007 at page 121). There was no evidence from any source that Dulce was a violent person.

Prior to the stop of the Ford Expedition, there was no evidence that either narcotics or drug money was inside Dulce's home on March 15, 2007. If the federal agents had no evidence that there were any illegal narcotics inside Dulce's house on March 15, 2007, there can be no inference that Dulce was carrying illegal narcotics from her house in those bags on March 15, 2007. If the federal agents had no evidence that there was drug money being stashed inside Dulce's house on March 15, 2007, there can be no inference that Dulce was carrying drug money from her house in those bags on March 15, 2007. Likewise there was not even a tip from any source that either narcotics or drug money or weapons were inside Dulce's home on March 15, 2007.

The police did not conduct a controlled delivery of illegal drugs into Dulce's house at any time and specifically any time near March 15th. The federal agents did not conduct a controlled purchase from inside Dulce's home at any time and

specifically any time near March 15th.

The police did not conduct a controlled delivery of drug money into Dulce's house at any time and specifically any time near March 15th. The federal agents did not conduct a controlled receipt of drug money from inside Dulce's home at any time and specifically any time near March 15th.

Federal law enforcement agents did not see Dulce traveling with Martin Castellanos at any time on March 15, 2007 prior to the stop of the Ford Expedition.

The police had not sought a search warrant for Dulce's residence, although they then possessed a search warrant for a house in Broward County.

While a surveilling law enforcement officer testified that Dulce appeared nervous when Dulce was going into her house on March 15th, there was no testimony that Dulce appeared nervous when she exited her home and placed the two bags into the cargo area behind the rear seats of the Ford Expedition.

Only hours before the stop of the Ford Expedition, Dulce's husband, Martin Castellanos, had been stopped at a warehouse and found to be in possession of almost $81,000.00. At that time, no weapon was found to be in the possession of Martin Castellanos. (Transcript of Dec. 19, 2007 at page 121-122).

There is no testimony that any of the federal law enforcement officers saw Dulce Castellanos make any furtive movement or try to hide anything, while she was seated in the passenger seat, either immediately prior to or at the time of the stop of this Ford Expedition

After the stop of the Expedition, there is no evidence that the police frisked Dulce's person for a weapon or even looked inside Dulce's purse. The Ford Expedition has a standard construction. That vehicle was correctly described a "huge" SUV, as "one of the larger SUV's", "like an Explorer on steroids" (Transcript of Dec. 19, 2007 at page 125). It is a very large vehicle, the construction of which can even be judicially noticed. The Ford Motors web site states that this vehicle is 221 inches [ i.e. more than 18 feet] measured front bumper to back bumper. The police observed Dulce place the two bags in question in the rear cargo area. Photographs introduced at the evidentiary hearing should show that the location

where those two bags were placed by Dulce were so far from the driver's seat that it was unlikely that those bags contained a weapon. This is so because that distance made it physically impossible for any human being sitting in the driver's seat to reach either bag to obtain a weapon for protection, in the event of a confrontation.[3] (Transcript of Dec. 19, 2007 at page 119). This was a circumstance that **these officers** knew prior to the stop of the Ford Expedition. Given the distance that Dulce was located in the driver's seat from where those two bags were put, a belief that those bags contained weapons that a person was using to protect other additional contents contained within those same bags becomes an irrational and, therefore, impermissible inference.

**Viewed objectively**, the above facts **do not permit** a finding that a on March 15, 2007 at the time of the stop of the Ford Expedition a police officer could possess a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the federal agents in believing that **Dulce Castellanos, herself**, was dangerous and that **Dulce Castellanos**

---

[3]     The likelihood that those bags contained a weapon is a fact different from whether those bags could contain a weapon. Normally, the police conducting a protective sweep have not seen the container being placed inside the vehicle prior to conducting a protective sweep of containers that could contain a weapon.

may gain immediate control of a weapon.  The facts known about Dulce Castellanos

do not satisfy the requirement of <u>Michigan v. Long</u>, *supra*, to entitle these federal

agents to make a protective sweep of the Ford Expedition at the time of the stop of

that vehicle.  This search, when viewed as conducted to protect the police from

possible violence by Dulce Castellanos against any of the officers, was not

reasonable.[4]  Indeed, these facts are materially identical to those in <u>Ybarra v. Illinois</u>,

444 U.S. 85 at 92-93 (1979), where the Supreme Court found illegal a frisk of a

person present during the service of a drug search warrant.


During the hearing, the magistrate judge questioned one of the federal agents

with the specific purpose of obtaining the following testimony.  There is a nexus

between firearms and narcotics.  People associated with narcotics need firearms to

protect themselves, to protect the proceeds and to protect the narcotics.  (Transcript

of Dec. 19, 2007 at page 123).  It was the application of this generalization **to Dulce**

---

[4]        A review of the testimony leads to the conclusion that the officers were
suspicious of what was in those bags and desired to look inside.  That is why the
officers wrote in their DEA report and testified that they conducted a security sweep
for <u>narcotics</u>, <u>money</u> and weapons.  There is no such thing as a protective sweep for
narcotics and money.  That is made clear by other portions of <u>Michigan v. Long</u>,
*supra*.  Nevertheless, it is now established that the true motive of a law enforcement
officer in conducting a search or seizure is irrelevant, if the facts establish that the
conduct was objectively reasonable.

**Castellanos** that was the basis upon which the magistrate judge upheld this initial search of the Ford Expedition. Report and Recommendation at pages 24-25, 31. The legal analysis on this issue that is contained in that Report and Recommendation does not rely on any other articulable facts permitting a court to objectively find that Dulce Castellanos, herself, was presently dangerous to the federal agents who stopped the Ford Expedition. Indeed, as just discussed, that is true because there is insufficient evidence to otherwise permit a finding that Dulce Castellanos, **herself**, was then presently dangerousness or posed a threat to the safety of any of the officers based on **her** conduct at that time.

That last portion of this analysis of the magistrate judge is not legally sustainable on the evidence elicited at the evidentiary hearing and the holding of Michigan v. Long, *supra*.

The war on drugs has been before the Supreme Court of the United States for more than forty years. Decisions of that court indicate that the mere fact that the case involves a criminal drug investigation is not a talisman that permits an end run of the minimal requirements for a protective sweep of an automobile contained in Michigan v. Long, *supra*.

The generalized concept at issue here was addressed by the Supreme Court in Richards v. Wisconsin, 520 U.S. 385 (1997). There, the lower appellate court held that it is was proper to assume that all felony drug crimes will involve an extremely high risk of serious if not deadly injury to a police officer. Based on that assumption, the lower appellate court held that policemen never have to knock and announce prior to executing a search warrant for narcotics. The Supreme Court rejected the concept of an automatic dangerousness presumption in criminal drug investigations. The Supreme Court started with the proposition that "[i]t is indisputable that felony drug investigations may frequently involve" a threat of violence, as well as possible destruction of evidence, but nevertheless held that there must be a case-by-case evaluation of whether either threat existed. "First, the exception contains considerable overgeneralization. For example, while drug investigation frequently does pose special risks to officer safety and the preservation of evidence, not every drug investigation will pose these risks to a substantial degree." Richards, 520 U.S. at 393. "If a per se exception were allowed for each category of criminal investigation that included a considerable – albeit hypothetical – risk of danger to officers or destruction of evidence, the knock-and-announce element of the Fourth Amendment's reasonableness requirement would be meaningless." Richards, 520 U.S. at 394. "It is the duty of a court confronted with the question to determine

whether the facts and circumstances of the <u>particular</u> entry justified dispensing with the knock-and-announce requirement." <u>Richards</u>, 520 U.S. at 394. Citing <u>Terry v. Ohio</u>, 392 U.S. 1 (1968) and the protective-sweep-of-the -premises decision <u>Michigan v. Buie</u>,[5] 494 U.S. 325 (1990), the Supreme Court concluded: "This showing is not high, but the police should be required to make it whenever the reasonableness of a no-knock entry is challenged." <u>Richards</u>, 520 U.S. at 394-395.[6]

---

[5]    <u>Buie</u> relied on <u>Michigan v. Long</u>, *supra*. <u>Buie</u>, 494 U.S. at 332-334. The articulable-facts requirement for a protective sweep of a home "is no more and no less than was required in <u>Terry</u> and <u>Long</u>, and as in those cases, we think this balance is the proper one." <u>Buie</u>, 494 U.S. at 334.

[6]    Prior to <u>Richards</u>, the Supreme Court twice addressed the lawfulness of a frisk of a person – as opposed to an automobile – during a drug investigation. In neither case did the Supreme Court employ a generalized suspicion of danger based on the mere fact that a drug investigation was being conducted.
    In <u>Adams v. Williams</u>, 407 U.S. 143 (1972), the frisk was upheld, because the officer was told that  the suspect was carrying narcotics and had a gun at his waist. <u>    Ybarra v. Illinois</u>, 444 U.S. 85 (1979) involved the serving of a search warrant for heroin at a tavern. <u>Ybarra</u> held that a cursory search of a patron, conducted during the execution of that drug search warrant, was illegal because the initial frisk was not supported by a reasonable belief that this patron was armed and presently dangerous. The police did not recognize that patron as a person with a criminal history and did not have any particular reason to believe that he might be inclined to assault an yof those policemen.. That individual gave no indication of possessing a weapon, made no gestures or other actions indicative of an intent o commit an assualt, and actted generally in a manner that was not threatening. <u>Ybarra</u>, 444 U.S. at 92-93.
    In drug case of <u>Minnesota v. Dickerson</u>, 508 U.S. 366 (1993), the criminal defendant did not challenge the lawfulness of the frisk for weapons. <u>Dickerson</u>, 508 U.S. at 377.

The Supreme Court's reasoning in <u>Richards</u> invalidates the legal reasoning of the magistrate judge in this case on that judge's <u>Michigan v. Long</u>, *supra*, analysis. When this Court eliminates the generalization that in any drug investigation a traffic stop justifies a <u>Michigan v. Long</u>, *supra*, security sweep of the vehicle, the facts proved at this hearing establish that there was no factual basis to establish that **Dulce** Castellanos posed a present danger to those law enforcement officers.[7]

<u>United States v. Neely</u>, 217 Fed. Appx. 849 (11th Cir. 2007) upheld the lawfulness of a security sweep of a car during a drug investigation following an investigative stop of that car. That search was upheld based on the individual facts regarding the driver that warranted that policeman in believing there was danger of a weapon, namely that this known drug dealer repeatedly reached under the seat. The Eleventh Circuit did not rely on a generalization that drug crimes are associated with weapons in this <u>post-Richards v. Wisconsin</u>, *supra*, opinion.

---

[7]     Two years after deciding <u>Michigan v. Long</u>, *supra*, the Supreme Court decided <u>United States v. Sharpe</u>, 470 U.S. 675 (1985). That case considered the stop of a truck to conduct a drug crime investigation. Nowhere did the Supreme Court suggest a generalized right to conduct a security sweep of that truck.

The coup de grace to this magistrate's ruling is the fact that there was no preexisting evidence that Dulce Castellanos, **herself**, ever dealt drugs in any amount – and not even any preexisting evidence that Dulce Castellanos, **herself**, ever transported drug money. There was not even evidence that Dulce Castellanos, **herself**, was ever present when anyone else delivered drugs or collected drug money or delivered drug money. <u>Michigan v. Long</u>, *supra*, requires a focus on the individual suspect – not others not present during the stop. For that reason, any reliance on the non-automobile-stop decision in <u>United States v.Diaz-Lizaraza</u>, 981 F.2d 1216 (11th Cir. 1993)[8] is misplaced. In <u>Diaz-Lizaraza</u>, the suspect came with and surveilled for one of the two other persons who were engaged in a drug transaction.

<u>Assuming for the sake of argument</u> that the federal agents had a right to conduct a protective sweep of the Ford Expedition, the magistrate judge also legally erred in holding that the execution of that search[9] was properly limited in accordance

---

[8]     That opinion preceded and, therefore, did not consider, <u>Richards v. Wisconsin</u>, 520 U.S. 385 (1997).

[9]     It is irrelevant if the search of this automobile was properly conducted, if, as argued here, that search was illegal from its inception and should not have been conducted at all. For that reason, this Court need not rule on the this alternative argument unless it holds that there was articulable suspicion that Dulce Castellanos, **herself**, was armed and presently dangerous.

with the dictates of <u>Michigan v. Long</u>, *supra*.

There is no dispute that the bags were placed in the cargo area of **this** excessively elongated vehicle.  There is no dispute that Dulce – indeed, any person – could not reach or stretch to touch either bag in question from the front seat in this Ford Expedition.  The photographs show that one would have to climb over every row of seats and then jump into the cargo area to then be able to open any of the two bags.  Nevertheless, it is technically true that the portion of the cargo area closest to the rear bumper "was fully accessible" to a person in the front seat[10].  (Transcript of Dec. 19, 2008 at page 124-126).

<u>Michigan v. Long</u>, 463 U.S. 1032(1983) states that "[t]he subsequent search of the car was restricte to those areas to which Long would generally have **immediate** control, and that could contain a weapon." <u>Long</u>, 463 U.S. at 1050.  "In this case, the officers did not act unreasonably in taking preventive measures to ensure that tehre were no other weapons within **Long's immediate grasp** before permitting him to reenter his automobile." " <u>Long</u>, 463 U.S. at 1051.

---

[10]     It is technically true that the roof of a house is accessible to anyone on the ground level.  In reality, no human can reach to the roof when standing at ground level.

On these facts, the immediate search of the two bags where they were located, was not "reasonable." Even in <u>New York v. Belton</u>, 453 U.S. 454 (1981), the Supreme Court was contemplating a "relatively narrow compass of the passenger compartment of an automobile" which was "within the area into wwhich an arrestee might readch in order to grab a weapon." Belton, 453 U.S. at 460. The Supreme Court was concerned with whether "the passenger compartment is **within reach of the arrestee**."

In this case, the search was not reasonable, because optical information and the laws of physics, both of which were in the possession of these federal agents, establish that neither bag was within reach of Dulce Castellanos if Dulce was allowed to reenter the driver's seat of this Ford Expedition. That is what those officers knew for a fact.

The concept that was the focus of <u>Belton</u> and <u>Long</u> is "the reach of the person," not the phrase "passenger compartment." For that reason, the Government should not be allowed to pull itself up by its bootstraps.

## 2. THERE WAS NO PROBABLE CAUSE TO BELIEVE THAT EITHER BAG CONTAINED CONTRABAND.

### A. Facts Relevant To The Probable Cause Issue.

To avoid redundancy, the defendant adopts here the same facts related above.

### B. Legal Analysis.

"[A] search is not to be made legal by what it turns up. In law it is good or bad when it starts and does not change character from its success." United States v. Di Re, 332 U.S. 581 at 595 (1948). Moreover, good faith on the part of the police officer does not equate with probable cause. Henry v. United States, 361 U.S. 98 at 102 (1959).

While the defendant has conceded articulable suspicion to justify an investigative stop, that concession does not establish probable cause to believe the contraband was contained in the Ford Expedition. Probable cause is a higher standard than articulable suspicion. Ornelas v. United States, 517 U.S. 690 at 695-696 (1996); Alabama v. White, 496 U.S. 325 at 330 (1990).

If there is probable cause to believe that a vehicle contains contraband, the police may search that vehicle without more. <u>Maryland v. Dyson</u>, 527 U.S. 465 (1999). Probable cause to search exists where the known facts and circumstances are sufficient to warrant a man of reasonable purdence in the belief that contraband or evidence of a crime will be found. <u>Ornelas v. United States</u>, 517 U.S. 690 at 696 (1996). Probable cause means a fair probability that contraband will be found. <u>Alabama v. White</u>, 496 U.S. 325 at 330 (1990).

The issue here is whether there was probable cause that there was contraband inside either opaque bag, when those two bags were placed in the cargo area of the Ford Expedition by Dulce Castellanos. The issue is not whether the police were engaged in a narcotics investigation.

The testimony established that Dulce Castellanos lived at her house with a person involved in illegal sale of narcotics. Obviously, Dulce talked with her husband. However, "[t]he inference that persons who talk to narcotics addicts is engage in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security." <u>Sibron v. New York</u>, 392 U.S. 40 at 62 (1967).

Dulce arrived at her house about three hours after her husband was stopped at a distant location. There was no evidence from which it can be inferred that Dulce, herself, knew that her husband was in the custody of the police and knew that the police seized money from her husband at the time she drove up to her house.

A marked police car was on the street in front of Dulce's house, when Dulce arrived. Dulce appeared nervous when Dulce entered her house. However, no more than fifteen minutes later, Dulce exited her house with those two bags and there was no evidence that Dulce was nervous **when leaving her house and while carrying those two bags**.

Dulce was carrying two heavy bags when she exited her house. The police assert that they believed that narcotics were in those bags. However, the police had no evidence that narcotics were ever **taken into** Dulce's house.[11] If there was no evidence that narcotics had ever been brought into Dulce's house, a reasonably prudent person could have no reasonable basis for believing that narcotics could have

---

[11]     By contrast, there are many cases involving informants or criminals providing the police with information that they saw drugs inside a house. There are many cases where police engage in a controlled delivery of narcotics into a residence. The facts elicited at this hearing fit none of those scenarios.

been taken out of that house.[12]

The police had no evidence that Dulce, herself, ever dealt drugs. The police had no evidence that Dulce ever accompanied her husband or her son-in-law to deliver drugs.

The police believed that one of the two bags was similar to a bag that Dulce's son-in-law had used as a container to transport narcotics two months before. That is not a basis for a reasonably prudent person to reasonably believe that all bags similar to the one used by the son-in-law will contain narcotics. There is no evidence that the bag used by the son-in-law was specially constructed to hide or hold narcotics in a secret compartment. Thus, the one similar bag that Dulce was carrying was not unusual so as to create an inference that this particular bag would contain narcotics.

---

[12]    The same is true regarding whether drug money was in either bag. There is no evidence that the drug money that was found in the possession of Martin Castellanos had ever been taken into or taken from Martin Castellanos's residence – which also was the residence of Dulce Castellanos.

To avoid redundancy, everything said above regarding whether there was probable cause to believe that any of the two bags contained narcotics also applies to whether any of the two bags contained money derived from the sale of illegal drugs.

Viewed objectively, the facts do not permit a legal ruling that the police has probable cause to believe that there was contraband inside either of the two bags that Dulce Castellanos was carrying when Dulce left her house and drove away from her home on March 15, 2007. "Riding in the car, stopping in an alley [in a residential section], picking up packages, driving away – these were all acts that were outwardly innocent. [The] movement [of the persons] in the car had no mark of fleeing men or men acting furtively. *** The fact that packages have been stolen does not make every ... package subject to seizure. The police must have reasonable grounds to believe that the particular package carried by the citizen is contraband. The weight of it and the manner in which it is carried might at times be enough. But there was nothing to indicate the cartons here in issue probably contained liquor." Henry v. United States, 361 U.S. 98 at 103-104 (1959). The finding in Henry that probable cause was lacking should govern this case.

Based on the above facts and legal argument, the report and recommendation of the magistrate judge should be rejected and Dulce Castellanos's motions to suppress should be granted.

Respectfully submitted,

/s/ George J. Vila
_____

| | |
|---|---|
| ARTHUR JOEL BERGER | GEORGE J. VILA |
| Florida Bar # 178861 | Florida Bar # 141704 |
| 12531 S.W. 124th Path | Suite 1020 |
| Miami, Florida 33186 | 1221 Brickell Avenue |
| Phone: (305) 235-2050 | Miami, Florida 33131 |
| | Phone: (305) 373-5707 |

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 24, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

s/ George J. Vila

GEORGE J. VILA